215 P.3d 1237 (2009)
The PEOPLE of the State of Colorado, In the Interest of M.M., JR., and A.M., Children,
Upon the Petition of the El Paso County Department of Human Services, Petitioner-Appellee, and
Concerning M.M., Respondent-Appellant.
No. 08CA0119.
Colorado Court of Appeals, Div. III.
April 16, 2009.
Rehearing Denied May 14, 2009.
*1239 Nancy J. Walker-Johnson, Guardian Ad Litem.
William H. Louis, County Attorney, Laura C. Rhyne, Deputy County Attorney, Colorado Springs, Colorado, for Petitioner-Appellee.
Davide C. Migliaccio, Colorado Springs, Colorado, for Respondent-Appellant.
Opinion by Judge ROY.
M.M. (father) appeals from the judgment terminating the parent-child legal relationship between him and his son, M.M., Jr., and daughter, A.M. Father contends the trial court erred by improperly admitting the results of two polygraph examinations, which formed the basis of the opinions and decisions of the caseworker and therapists to deny unsupervised visitation and to terminate efforts to reunite the family.
In this case we are required to address the admissibility and use of the results of polygraph examinations in the management of a dependency and neglect action, the termination hearing, and the opinions and recommendations formed by expert witnesses. We vacate the judgment terminating father's parental rights, and remand the case for further proceedings consistent with this opinion.

I. Procedural History
This matter commenced in the trial court on September 16, 2005 by the filing of a petition in dependency and neglect concerning two children, a one-year-old son and a two-year-old daughter. Father admitted the children were dependent and neglected and agreed to the entry of an adjudication, which was initially deferred and ultimately entered on September 22, 2006. Meanwhile, a treatment plan was adopted for both parents on November 1, 2005.
Custody was granted to the Department of Social Services (the department), and the children were initially placed with the maternal grandmother, with father having supervised visitation. Because the maternal grandmother had a health problem, the children were transferred to a foster-adopt home on January 20, 2006, where they remained for the balance of the proceedings.
The department's initial permanency plan contemplated a return of the children to the parents by June 16, 2006, or to a placement within the family by September 16, 2006. In May 2006, the time for returning the children to the family home was extended to December 24, 2006. On May 27, 2006, the caseworker reported that father had completed his alcohol therapy, would complete his anger management program within a few weeks, and was visiting the children three times a week.
The permanency plan as of December 13, 2006 was to return the children to the parents by March 20, 2007, with concurrent planning for placement with relatives by September 20, 2007. The status report dated December 15, 2006 stated that father had completed his substance abuse program and his parenting program, was attending family violence group and individual sessions, and that staffing was due December 19, 2006. The expedited permanency planning guidelines were extended to December 20, 2006.
On March 9, 2007, the department filed a motion supported by an affidavit to further extend the expedited permanency planning guidelines. The "Family Services Plan" attached recited:
[Father] is currently attending the family violence group and individual therapy at The Family Center on[c]e a week. He has been participating in his group. He recently started individual therapy to assist him to understand the material that is being covered in group. [Father] continues to maintain employment.
In a written status report, dated March 14, 2007, a program to re-integrate the children and the parents commenced in early February 2007. The children had supervised visits with the parents three times, twice at home and once in the community. The supervisor reported that the visits had gone well at the home.
*1240 Then, day care workers reported that the daughter's behavior changedshe became quieter and more physical with other children. The status report further stated that father had completed substance abuse treatment and a parenting program, was attending family violence group and individual sessions, and was working on his "clarification letter," and that unsupervised visits with the children would have to await completion of that letter. Father was also scheduled for a domestic violence polygraph examination. In March 2007, the daughter made allegations, later proved unfounded, of sexual abuse against her father.
On March 14, 2007, the magistrate extended the permanency planning guidelines to June 30, 2007, for the family, and December 30, 2007, for adoption. She further ordered that any polygraph examinations be filed with the court and sealed.
On May 4, 2007, the department filed a motion to terminate the parent-child legal relationship. The motion stated that despite substantial progress, the treatment plan had failed to rehabilitate the parents and they were unfit. On May 7, 2007, the department filed the report of a polygraph examination administered April 17, 2007, in which father was determined to be deceptive in response to two questions: (1) whether he had stuck any object in the daughter's "butt"; and (2) whether he had placed any object in the daughter's private body parts.
On July 30, 2007, a report of a second polygraph examination, administered to father on July 11, 2007, was filed with the court. The report stated that father was deceptive on questions essentially the same as those asked during the first polygraph examination.
In a status report dated August 1, 2007, the department stated:
[Father] has completed his substance abuse treatment. [Father] has completed his parenting program. [Father] is currently attending the [treatment] at the [Treatment Center]. The report from the facilitator is that [father] is participating in the group and that he has completed and presented his abuse history. He is also attending individual therapy once a week at the [Treatment Center]. [Father] has completed his clarification letter. [Father] had completed the polygraph on April 16, 2007 and he was deceptive. The [Treatment Center] had worked with [father] to process through some old issues that may have caused him to be deceptive and the polygraph was rescheduled. He retook the polygraph after many weeks of counseling and processing on July 11, 2007 and he again was deceptive.
After the second polygraph [the mother] asked [father] to move out of the home.
A Pager report was received by this worker on March 8, 2007 regarding a disclosure [daughter] made regarding her father. The incident was investigated and [daughter] was interviewed at [the Investigative Agency]. The allegation was unfounded.
(Emphasis added.)
It is apparent from the September 18, 2007 status report that father had been removed from the family visitation and had individual supervised visitation once a week, and that his participation in therapy declined.
On August 3, 2007, the court entered an order appointing a Court Appointed Special Advocate (CASA) volunteer. The volunteer filed a court report on September 24, 2007, which, with respect to father, stated:
CASA believes both children would be at a safety risk if placed with [father] due to the following reasons:
1. Two failed polygraphs dated 4/16/07 and 7/11/07 regarding sexual allegations towards his daughter.
2. According to ... [the] group therapist at The Family Center, voice mail dated September 13, 2007, [father] is not actively participating in group therapy.
3. According to ... individual therapist at The Family Center, interview of September 14, 2007, she stated she does not know why [father] failed the two polygraphs. They are working on getting to the bottom of the cause(s).
4. According to [the daughter's therapist], she cannot rule out [father] as the perpetrator of [daughter's] sexual abuse *1241 due to two disclosures by [daughter] and two failed polygraphs.
After a termination hearing, in its written order terminating parental rights of both parents, the trial court stated, as to father:
That the Court does find the original treatment program as to [father] had to do with substance abuse and domestic violence. [Father's] treatment was extended over a significant period of time. [Father's] treatment providers testified he did attend treatment and was amenable to treatment, but that [father] has not internalized the treatment by not utilizing coping skills during times of stress and claiming he was abused and not the abuser. The Court utilizes those statements and comments of the treatment providers whose credentials were unchallenged. In taking into consideration the expedited permanency planning guidelines, [father] has not successfully complied with the Treatment Plan and is unfit. [Father's] parental rights should be terminated. The Court did not take into account the allegations of sexual abuse or the polygraph results of [father].

II. The Termination Hearing
The termination hearing commenced November 19, 2007, was completed on December 7, 2007, and was held before the district court.

A. Children's Therapist
The first witness was the individual therapist for the children. She testified that in March 2007 the daughter disclosed to the witness and to her kindergarten teacher that she had been sexually abused by father. Father was then asked to take a "therapeutic polygraph" examination to rule him out as a suspect.
Following an objection by father, the county attorney argued that evidence about the polygraph examination was not offered to prove that father had done anything, but only to show "the therapeutic reasoning for why reunification was not possible in April, 2007, as well as now." Father's objection was overruled. The witness testified that the daughter engaged in some conduct typical of sexually abused children. Then the following exchange occurred:
Q. After he took the polygraph examination, were you able to recommend that he have unsupervised contact with the children at that time?
A. I was unable to recommend that he have unsupervised contact at the time after the polygraph.
Q. Why?
A. Because he did not pass the polygraph and was not going to present the children with a clarification that wasn't completed in regards to the accountability for past [domestic] abuse issues.
....
Q. Once [father] had had a deceptive polygraph examination in April, 2007, what were your recommendations about contact with the children and their parents at that time[?]
A. At that time we pulled them out of the home because of the concerns and had them go back to [the Visitation Center].
....
Q. Why have you not been able to recommend supervised contact yet for [father]?
A. At this point, he had not completed his treatment at [The Treatment Center].
Q. Were there any other considerations as to why you had not expanded his visits?
A. There was another polygraph that was notthat was failed as well in July 2007.
Cross-Examination by Father
Q. After the allegations [the daughter] made, was she ever interviewed by anyone?
A. My understanding is she was interviewed several times in regards to this allegation.
Q. During those interviews, did she make those allegations again?
A. My understanding is they were unfounded.
....
Q. Nevertheless, you don't feel it is safe?
A. At this point with not having the therapy completed and passing the polygraphs as part of therapy, no.

*1242 Q. Do you believe that he cannot complete therapy?
A. He might be able to complete therapy once he is able to pass a polygraph and be honest with his therapist.
....
Q. Nevertheless [the allegations are unfounded,] it's up to [father] to disprove them at this point?
A. At this point, part of the therapeutic issue was to address it through a polygraph.

B. Father's Therapist
The second witness was father's individual therapist at the Treatment Center. During his examination, the following exchanges occurred:
Q. Has [father] been successfully discharged from treatment in the family violence group?
A. He has not.
Q. Can you please explain that?
A. As I mentioned, [witness explains elements of the program]. [Father] has technically completed all of those. He completed his relapse prevention program, I think, sometime around July of this year. At that time, however, an issue was raised by the daughter in the family that there might have been some inappropriatewell, some sexual contact. Of course, it would be inappropriate.
....
In failing that polygraph, that raises for us several issues. The principal onesit's not so much the failure of the polygraph that's the problem. What the failure of the polygraph indicates is that there's notall the facts that need to be known about the situation have not been revealed. So it indicates that [father] is not telling us everything there is to know about or that would be important to know about his contact with that child or with children in that category.
....
Q. And he had done the relapse prevention [for anger management]?
A. [Yes.] Our concern is that he's not using them or he admits to choosing not to use the materials.
Q. So would you say that he has internalized his treatment that has been provided to him for over a year?
A. That's kind ofthat's an interesting question. I think he's internalized it in the sense of knowing what the tools are and how to use them, and he is able to use them at times. But in the sense of being able to stop himself and say I'm going to choose to do this instead of that, I don't think he has.
Later in his testimony, the witness relayed an instance in which the Visitation Center was closed, of which father had not been advised, on a visitation day when father had planned a birthday party for his son. The witness stated that father was aware of his coping skills but declined to use them and was angry for an extended period with the department.
Q. How do you use these polygraphs in a therapeutic setting?
A. .... So the questions are asked and you get the comparison. If you get a comparison that is classified in the truthful range, then the American Polygraphy Association's data indicates that it is a 95 to 98 percent probability that they're answering correctly; that that is, in fact, the truth. However, when you get a deceptive response, when you get a trace that appears to be deceptive, it's not so clear what that means. It may mean that the event occurred.
To give sort of a hypothetical along this line, if we're asking the question about sexual contact with a child, a truthful response would give us a 95 to 98 percent probability that they have not had sexual contact with the child if they answered no. However, if they're deceptive with the answer of no to that question, it's about a 50/50 probability that they have done or haven't done that particular thing.
....
If I use my hypothetical example of having sexual contact with a child, they might have had a child on their lap who was squirming around and their body functioned *1243 like bodies function and they got a minor arousal and they don't want to talk about that because they think that's shameful. That can cause a deceptive response on the polygraph. What we know at that point for therapeutic purposes is we don't have all the information yet. Then our job is to work with the client to retrieve all the information that's necessary on that subject.
Q. If [father] had passed the first polygraph, would you have been recommending that he be able to have unsupervised contact with his children?

A. Actually, we had discussed that prior to the polygraph; and I don't believe anyone in the therapeutic program, individual or group, would have had any reservations about unsupervised contact had he passed that polygraph.

(Emphasis added.)

C. The Forensic Psychologist
The next witness was a forensic psychologist, a consultant who performed a psychosexual evaluation on father.
The witness indicated that he was certified to perform "offense specific evaluations," which pertain to persons convicted of a sexual offense. He recognized that that was not the case here, and he was not aware of any certification for performing such evaluations on persons who had not been convicted of a sex offense. In conformity with the sex offender evaluation, he administered an Able Screen, which is based on data collected from a large number of convicted sex offenders to predict recidivism. Then the following exchange occurred:
Q. Okay. And did you make any recommendations as to what type of contact [father] should have with his daughter?
A. Yes. I recommended ... caution in allowing him to have unsupervised contact with his daughter until some of the issues could be clearer; the issues namely being he has two failed polygraphs that were specific issue polygraphs, and then in my testing on the Able Screen, his sexual interest waswas determined to relate to adult females, adolescent females, as well as younger females.
Q. So let's talk first about ... failed polygraphs. In that context, do you take that as any type of admission of guilt or innocence? How do you use polygraphissue-specific polygraphs in a therapeutic
[Father's Counsel]: Your Honor, I'm going to object [to the polygraph].
After an extended discussion concerning the admissibility and use of the polygraph examination, including citation to Colorado authority, the trial court ruled:
[The question] was appropriately phrased to allow the witness an opportunity to say how he did use the results or the significance of a polygraph examination in a therapeutic context. It's not until the witness answers that question that we might have the basis for further legal consideration of the matter.
The Court is also aware that, if nothing else, we are making a record for consideration by an appellate court on this issue. And the general assumption is that courts; that is, judges in particular, can disregard testimony that is inappropriate or inadmissible for some reason. If this was a jury trial, we might be a little more circumspect, but it's not. So we're [going to] allow the witness to testify; at least to answer the question that was asked of him, and we'll just see what happens. So at the moment the objection is denied. And, Doctor, do you remember the question?
After the question was repeated, the witness responded:
The way they're used in the therapeutic setting is as a probability statement; in other words, through a lot of experience with individuals that have been involved in sexual behavior with children, it's become quite clear that most individuals have difficulty talking about the reality of that behavior and very often are in denial. So in this state, polygraphs are used regularly in treatment to help people break through possible denial, if, in fact, that's occurring.
The way I view it as a treatment provider is as a probability statement, notnot a statement of fact, and it typically is used to encourage someone to be more truthful about what might have happened.

*1244 Cross-Examination by Father
Q. [Y]ou testified that you were made aware during the referral that father's daughter had made allegations; is that right?

A. That's correct.

Q. Were you also made aware that those... allegations were investigated twice by the [department] and were unfounded?

A. No, I was not aware of that.

(Emphasis added.)

D. Father's Individual Therapist (Second Examination)
Following the forensic psychologist's testimony, the second witness, father's individual therapist, was recalled after having had an opportunity to review the forensic psychologist's report. During direct examination, the following exchange occurred:
Q. Okay. Have you been able to formulate any treatment recommendations for [f]ather ... based on this [forensic psychologist's] evaluation?
A. It's difficult to do that. I mean, [the forensic psychologist] has not made specific treatment recommendations. He has made some general treatment recommendations. The key issue in making a treatment recommendation in this case is not so much the psychosexual evaluation itself as the fact that we have this open issue of the allegation and then the failed polygraphs. And, I mean, you can make treatment recommendations based on that, but they're different. I mean, in this case you have to deal with the client, specifically [father] in this case. Based on this evaluation, you have to deal with [father] as a ... denier or someone who has at least possibly committed an offense and is denying it, which it's a different treatment. You've got to deal with the denial first or resolve the denial before you can actually begin with treatment.
Q. And so your statementyour testimony previously was that [f]ather is not at the point of being successfully discharged from treatment?
A. That's correct. And I think we need carefully to differentiate. There are two treatment profiles involved here. The first treatment profile is the one that he's been engaged in for many months now, which is the family violence, which deals with issues of domestic violence.
The second treatment issue, which is raised by the allegation and then we haven't been able to clear those allegations by use of the polygraph, that issue is an issue of sexualsexual addiction or sex offender treatment. And we can'twe're unable to determine at this point exact[ly] what that would consist of, because we don't know if we actually have a denial or if we have an unsupported allegation.

(Emphasis added.)
Cross-Examination by Father
Q. [Y]ou continue to testify that [father] needs to approach the denial. Are you aware that investigations were made about these allegations and the investigations came back unfounded?
A. I'm aware that there was some concern about the allegations. I'm not aware that there was an investigation that came back unfounded.

Q. If there is testimony that those allegations did come back unfounded, would that change your opinion?

A. No, sir.

Q. So as far as you are concerned, as long as there's an allegation, it's up to [father] to explain why it wasn't true?

A. [Finding] is a matter of fact, treatment is a matter of experience, and in this case, regardless of what the [findings] of the child's statement [are], [father] is still presenting as a denier.

Q. And that's
A. That's what we would have to perform treatment on.

Q. And that's because of the polygraphs; is that right?
A. Not entirely. It's because there's an allegation, there's been a process of discovery, if you will, in which we callI'm [going to] lose the termwhich we call disclosure, and [father] has disclosed what he says is all of the information, and yet he has failed two polygraphs, which continues *1245 the concern that there is risk that the child has been abused in some way. Whether it's that specific way or not, we can't say until we clear the polygraph.
....
Q. [I]sn't it true that in order for you to... consider him safe to have his children, you need him to pass this lie detector test?
A. What I need him to do is reveal the information that he's not revealing. Passing the polygraph will simply confirm that he's given us the information we need to have.
Q. Even if he doesn't know what's causing him to fail those?
A. If he doesn't know it at this point.
(Emphasis added.)

E. The Polygraph Operator
The fourth witness was the first polygraph operator who performed the examination on April 17, 2007. Father objected to the testimony, and the objection was overruled. The witness did not discuss the polygraph examination or its results. Instead, on direct, he was asked about statements made by father in the pretest interview. Father said, "I am not abusive, I was the one being abused." The witness also testified that father admitted taking a Vicodin tablet without the benefit of a prescription, the source of which he could not remember but speculated it may have been a co-worker. Finally, the witness testified that father admitted a history of drug use including illegal drugs but had not had a drink since New Year's Eve 2006.

F. Father's Domestic Violence Group Counselor
This witness became involved with father in August 2006 in a group therapy context. The witness testified that father had completed the domestic violence curriculum but had, on occasion, chosen not to use the coping skills he had been taught.
With respect to the statement to the first polygraph operator about the mother being the abuser, the witness stated:
[Father] had made a statement that he was not the abuser, that he was the one that had been abused. And [father] had completed a fairly extensive abuse history on his wife, and had written a clarification to his wife that indicatedwell, indicated a fair amount of abuse towards her. And so for him to make that statement, one of the concernsongoing concerns is that [father] has seen himself as a victim in this whole process, and even though he had completed the stages of treatment and written the words, I was shocked to hear that statement made to the polygrapher, because it was a complete reversal of everything that he had done in treatment.
The witness appeared not to recognize that the statement to the first polygraph operator was in April 2007, well prior to the completion "on paper" of his domestic violence program. With respect to father's participation in group sessions after he failed the second polygraph, the witness stated:
[A]fter his second polygraph ... [father] really regressed. He becamewithin the context of group, he really became angry and kind of resistant and oppositional for a while. He was not participating in treatment. He would show up and not really participate, even though he had been given very clear instructions about what needed to happen. And he denied that he had been told what to do.
And, as we observed, he became more and more escalated, and finally he was confronted on that about a month ago, maybe a little bitmaybe five weeks ago, that he clearly was not utilizing the tools that he was given in group, and he told us without anyvery bluntly that he didn't want to use the tools he had gotten in group, and that he wanted to be where he was.
And we talked to him about how that wasn't helpful, and, to his credit, he did start calming down and start using groups and start using treatment.
With respect to her present recommendation on unsupervised visitation, the witness stated:
I have two concerns about it. One would be on the side of the fact that he's not successfully completed treatment, and he has chosen not to utilize the skills that he has had or that he has gained or been *1246 given, and that that was a choice. And it concerns me when a parent can go all the way through a treatment process and then still behave in the same ways that they behaved when they entered treatment.
The other side of thethe other issue that concerns me, that there are a number of indicators that the sexual abuse allegations against him may have some foundation. And I'm concerned about the two failed polygraphs. And I'm concerned about while I only briefly read his offensespecific evaluation or psychosexual evaluation, that there was an indicator of risk.

G. The Caseworker
The caseworker, who had been on the case since May 2006, testified next. As to her present recommendation on whether parental rights should be terminated as to both parents, she testified:
I believe that the children need permanency in this case. They have been in foster careactually out-of-home placement since September of '05, and I believe that the children need permanency. And that they have been in the same home since around the end of January, February of '06, and I believe that the children need to have some sort of stability at this time.
During her extended testimony concerning the mother's conformance with her treatment plan, the witness stated:
We waited for the providers to give us the okay for them to start parenting together, and then we started doing visits in the community supervised. Then we started taking the visits to the home. And then that's when the allegations came regarding [father], so we backed off with [father] and started focusing more with Mom on the reunification.

(Emphasis added.)
With respect to father's compliance with his treatment plan, the witness testified that he had participated and completed some of the treatment goals. The deficiencies she saw were that (1) he had not completed his treatment goals on domestic violence, referring to the testimony of others; (2) he consumed alcohol in December 2006 after completing alcohol treatment; (3) he had made a statement to the first polygraph operator that he was not an abuser; (4) he failed to complete the domestic violence/anger management program because he had not been discharged from the program; and (5) he was not using his anger coping skills, apparently after the second polygraph. With respect to whether she thought the children would be safe if returned to father, she testified:
No, I do not. I do not believe that they would be in a safe environment due to the reports of the other professionals. He is still currently on supervised visits with his children. The visits were reduced to once a week upon the first failed polygraph, and they have maintained that once a week since the first of May. So I guess my answer would be probably, no, that there is not a stable environment or safe environment to return the kids to him at this moment.
With respect to the daughter's allegations, the witness testified:
They came up in April of 2007. When she went into foster care in February of '06, there wasshe had made an allegation that someone had poked her in the butt, butand it was a mean man. She didn't at that time state that it was [father]. She had stated to a provider at her school, in I believe it was the end of March 2007, that it was [father].
With respect to domestic violence, she testified she had no knowledge of any further domestic violence. With respect to the daughter's allegations, the following exchange occurred on cross-examination by father:
Q. Was anything included in the treatment plan regarding [father] to rule out sexual abuse?
A. No.
Q. Was the treatment plan ever amended to include sexual abuse treatment?
A. Not to my knowledge.
Q. Was [daughter's accusation] investigated by [the Investigative Agency] regarding these allegations?
A. Yes, ... it was unfounded.
*1247 With respect to the relationship of the children to father, the witness stated:
Q. Has [father] been cooperative with you?
A. Yes.
Q. Is he bonded with his children?
A. I believe he is.
Q. Are they bonded with him?
A. I believe they are.
Q. Wouldn't it hurt them to be permanently separated from their parents at this point?
A. That's a tough question. I believe that the children have a very goodare bonded to [father] and are also bonded to the foster parents. The foster parents [father] has been in the children's life once a week probably since last May, okay? And the foster parents are with the children more. Not to say that there's not and I'm not [going to] say that there is not a bond, because I know there is a bond there, but the children need to be somewhere where their needs can be met and their life is not in an upheaval at this point.
Q. [L]et's make something else clear at this point. Has [father] ever said that he does not want to have more visits with his children?
A. No.
Q. Has he ever asked to have his visits reduced?
A. No.
Q. Those visits were reduced on recommendation of the treatment providers and yourself in this case; isn't that right?
A. That is correct.
When asked why she had not followed up with father concerning his consumption of alcohol in December 2006, the witness responded:
I believe because at the time the bigger issue was with the failed polygraph and looking at whether or not [father] would be able to be a placement option or not for these children.

H. Trial Court's Bench Ruling
After extended closing argument, the trial court ruled orally from the bench stating, in pertinent part, as follows:
Turning then to the father, the Court believes that we can consider this matter in a way that does not bog us down in the legal dilemma which the Court discussed with Counsel.
The Court does find that the original treatment program for the father had to do with two primary questions[:] his substance abuse and his domestic violence. Treatment was attempted over an extended period of time. Yes, the experts say that they think the father, as an intellectual matter, might be said to have completed the program in that he attended all the sessions and he attended all his appointments with his caseworker andbut it was their assessment that he had just not internalized what he had learned.
And the Court does take into account what was testified to and is really uncontested as a factual matter. The father, admittedly during a time of stress, made the statement that he didn't intend to use his coping skills that he had learned during all this treatment, because he just didn't want to do that.
I can understand the argument that that was a time of stress for him, but the Court believes that, if nothing else, he should have learned that it's at that very time, when he is under stress, that's when he most needs his coping skills. That's when they are of the greatest benefit to him. That's when he needs to put them into play.
So while the Court can understand the father's comment, the Court thinks the comment is inappropriate, and does reveal what the experts say in their evaluation of the father, which is he has not internalized what he learned during his therapy.
The second statement of the father which was of a concern to the treatment providers was the statement that he felt that he was the one abused during his relationship with his wife. And that is simply not consistent with the assessment of everyone else who had dealt with him for an extended *1248 period of time about the question of domestic violence or spousal abuse. Again, in the Court's opinion, that shows that he just has not internalized and taken responsibility for his participation in the problems that led to this situation.
So the Court finds from those two particular comments and the evaluations of the expert witnesses, whose credentials were not challenged by [father's] Counsel, and their unanimous opinion that the father has not reasonably complied with his treatment program and that it doesn't appear that he's [going to] be able to comply within a further reasonable period of time.
....
And, for the record, the Court wishes everyone to understand, including any appellate court that might consider the matter, the Court has not taken into account the allegations of sexual abuse and the question of failing or passing or the validity of the polygraph tests. So, in the Court's opinion, it was not a basis for the Court's ruling, and no one should claim that it was.

III. Termination Criteria
A court may terminate a parent-child legal relationship under section 19-3-604(1)(c), C.R.S.2008, if it finds that the parent did not reasonably comply with a treatment plan approved by the trial court or it has been unsuccessful, the parent is unfit, and the parent's conduct or condition is unlikely to change within a reasonable time. People in Interest of A.M.D., 648 P.2d 625, 637 (Colo.1982). The court must also find that termination is in the child's best interests. § 19-3-604(3), C.R.S.2008; C.S. v. People in Interest of I.S., 83 P.3d 627, 640 (Colo. 2004); People in Interest of C.H., 166 P.3d 288, 289 (Colo.App.2007).
A treatment plan is successful if it renders a parent fit or corrects the conduct or condition that led to state intervention. In Interest of K.D., 139 P.3d 695, 699 (Colo. 2006); People in Interest of D.P., 160 P.3d 351, 354 (Colo.App.2007).
In determining whether a parent's conduct or condition is unlikely to change within a reasonable time, the court may consider whether any change has occurred during the pendency of the dependency and neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. K.D., 139 P.3d at 700; People in Interest of D.L.C., 70 P.3d 584, 588-89 (Colo.App.2003). A reasonable time is relative and must be determined by considering the physical, mental, and emotional conditions and needs of the children. K.D., 139 P.3d at 700; D.L.C., 70 P.3d at 589; see also § 19-3-604(3).
When, as here, a proceeding involves children under the age of six, reasonable or successful compliance with a treatment plan cannot be found if "[t]he parent exhibits the same problems addressed in the treatment plan without adequate improvement" and remains unable to meet the children's needs. § 19-3-604(1)(c)(I)(B), C.R.S.2008; People in Interest of J.A.S., 160 P.3d 257, 260 (Colo. App.2007).

IV. The Polygraph Examinations

A. Admissibility
Evidence of polygraph test results and the testimony of polygraph examiners are per se inadmissible in both criminal and civil trials. People v. Anderson, 637 P.2d 354, 362 (Colo. 1981) (criminal case); In re Marriage of McCaulley-Elfert, 70 P.3d 590, 594 (Colo.App.2003) (dissolution of marriage); see also Valley Nat'l Bank v. Chaffin, 718 P.2d 259, 262 (Colo.App.1986).
In Anderson, 637 P.2d at 360, the trial court entered a pretrial order granting the defendant's request and admitting the results of a polygraph. The prosecution appealed. The supreme court, observing that the scientific theory was inadequately developed, stated:
Consequently, the mere recordation of physiological data, even with the best of instruments, does not alone make the use of polygraphs scientific. To assure reliability, clear, unequivocal evidence about how often and under what circumstances such data permit the accurate detection of deception is also needed. Because of the possibility that several physiological or psychological factors impair the accuracy *1249 of the polygraph measurements, such evidence does not exist. Accordingly, we are not persuaded that the physiological stress of lying necessarily produces a series of responses which can be reliably characterized as indicating deception.
Id.; see also People v. Reynolds, 638 P.2d 43, 44-45 (Colo.1981) (polygraph may not be used in the reconsideration of a sentence under Crim. P. 35(a) to challenge a guilty verdict).
In Valley National Bank of Cortez v. Chaffin, 718 P.2d 259, 262 (Colo.App.1986), a division of this court extended Anderson to civil cases. There, the trial court admitted polygraph examinations to bolster the credibility of the plaintiff's employees who had testified in the trial. A division of this court stated: "Thus, we hold that Anderson is applicable to civil trials, and the trial court therefore erred in admitting the results of polygraph examinations, and the testimony of the polygraph examiner, into evidence." Id.
Here, in the trial court the department relied on In re Marriage of McCaulley-Elfert. There, in a dissolution of marriage context, the issue was parenting time with the parties' son. There were allegations that the husband had abused the wife and her daughter. When the wife was asked what made her believe abuse had taken place, she responded, "A lie detector test that he took." 70 P.3d at 594. The trial court admitted the statement over the husband's objection but stated it would not admit the results and would not consider the statement for its truth. The wife then testified that the husband had taken three polygraphs, which convinced her that abuse had taken place. Id. On appeal, the division found no reversible error because the trial court was aware the husband had taken polygraphs from the pleadings filed in the case, and the wife's belief was separately supported by the opinion of the daughter's therapist. Id. Thus, the division concluded, the trial court's findings of abuse were based on other competent evidence. Id.
While there are other Colorado cases dealing with one aspect or another of polygraphs, the most recent pronouncement on polygraphs is Bloom v. People, 185 P.3d 797 (Colo.2008). In Bloom, the defendant was convicted of sexual assault on a child. On review, the defendant contended, inter alia, that the trial court erred in not granting a mistrial after one witness stated that a defense witness had failed a polygraph. Id. at 800. In addressing the confrontation issue, the supreme court pointed out that the reference to the polygraph was not admitted into evidence, the jury was instructed to disregard it, and the jury is presumed to follow the instruction. Id. at 805. Turning then to the due process issue, the court (1) characterized the statement as inadvertent; (2) pointed out that the jury knew the defense witness was a convicted felon; (3) noted the reference was not to the defendant's polygraph; and (4) also noted the trial court gave a curative instruction. The supreme court then concluded that under the totality of the circumstances, the statement did not render the trial fundamentally unfair and did not violate the defendant's right to an impartial jury. Id. at 805-06.
Here, by contrast, the polygraph evidence and the reaction of the treatment professionals to it (1) consumed most of the trial; (2) supplanted father's treatment plan; (3) controlled or significantly influenced every recommendation by the treating and supervising professionals concerning unsupervised visitation and father's fitness as a member of a reunited family; and (4) thereby essentially eliminated any chance father had to retain a parent-child relationship with both of his children. This was not an off-hand, inadvertent, brief, and unanticipated reference to a person taking or flunking a polygraph examination. Thus, in our view it is not entitled to the small shelter provided by Marriage of McCaulley-Elfert and Bloom.
The trial court admitted the polygraph evidence on the basis that in a trial to the court a judge is presumed to be capable of separating the admissible evidence from the inadmissible and decide the case solely on the former. In the context of a bench trial, the prejudicial effect of improperly admitted evidence is generally presumed to be innocuous. There is a presumption that all incompetent evidence is disregarded by the trial court in reaching its conclusions, and the judgment *1250 will not be disturbed unless it is clear that the court could not have reached the result but for the incompetent evidence. While this presumption is somewhat weakened given that the trial court overruled the objections to the polygraph evidence, the presumption is still appropriate, as the trial court did not accord weight to the improper statements in its decision. See Liggett v. People, 135 P.3d 725, 733-34 (Colo.2006); People v. Kriho, 996 P.2d 158, 172 (Colo.App.1999); People v. J.M., 22 P.3d 545, 547 (Colo.App.2000); People in Interest of B.L.M. v. B.L.M., 31 Colo. App. 106, 109, 500 P.2d 146, 148 (1972); see also People v. Fulton, 754 P.2d 398, 400 (Colo.App.1987).
Due to the lack of a scientific basis and reliability, it is inappropriate for an expert witness to rely on polygraph results to form or render any opinions. In the trial court, the department argued that the experts could testify about the polygraph and its role in the formation of their opinions and recommendations. All of the department's witnesses, except the polygraph operator, were qualified and accepted as expert witnesses in their respective fields and based their opinions or recommendations, in whole or in part, on the polygraph examinations.
Under CRE 703, experts may testify as to facts and data that are not otherwise admissible in evidence if the facts and data formed the basis of the expert's opinion and are of the type reasonably relied upon by experts in the field. Leiting v. Mutha, 58 P.3d 1049, 1054 (Colo.App.2002); People v. Griffin, 985 P.2d 15, 18 (Colo.App.1998). However, expert testimony must be grounded in the methods and procedures of science, not on a subjective belief or unsupported speculation. People v. Ramirez, 155 P.3d 371, 378 (Colo.2007). Expert testimony must be reliable, which requires that the scientific principles used by the expert be reasonably reliable and that the expert is qualified to opine on the matters. People v. Shreck, 22 P.3d 68, 77-78 (Colo.2001). Testimony lacking an analytically sound basis is speculative opinion testimony which is unreliable and inadmissible. Ramirez, 155 P.3d at 378. A court determines the reliability of a scientific method by considering the totality of the circumstances. Shreck, 22 P.3d at 77-78.
However, when, as here, the underlying basis for the expert opinions and recommendations is not accepted as reliable by the courts, the expert's testimony itself is inadmissible. In People v. Diaz, 644 P.2d 71, 73 (Colo.App.1981), the defendant was charged with reckless manslaughter. An expert witness was called to express an opinion of the defendant's mental state based, apparently in part, on information gained through hypnosis. A division of this court reversed the conviction because the trial court did not restrict the scope of the prosecution's cross-examination of the defendant. Because it would arise on retrial, the division addressed the use of hypnosis as a basis for an expert opinion. The court stated:
Hypnosis has not been accepted as a reliable basis for such an opinion [of a person's mental state]. See, e.g., Greenfield v. Robinson, 413 F.Supp. 1113 (W.D.Va. 1976); [People v. Mack], 292 N.W.2d 764 ([Minn.] 1980). See also McCormick on Evidence, § 208 (E. Cleary 2d ed.1972); Diamond, Inherent Problems in the Use of Pre-Trial Hypnosis on a Prospective Witness, 68 Calif. L.Rev. 313 (1980). If polygraph tests are per se excluded from evidence, surely evidence gained from hypnotic trance should also be excluded. See People v. Reynolds, ... 638 P.2d 43 ([Colo.1981]). See also California v. Blair, 89 Cal.App.3d 563, 152 Cal.Rptr. 646[, vacated, 25 Cal.3d 640, 159 Cal.Rptr. 818, 602 P.2d 738] (1979). On retrial, the psychiatrist should not be permitted to testify as to the mental state of the defendant if his opinion is based on information gained through hypnosis.
Id.; see also Farmland Mut. Insurance Cos. v. Chief Indus., Inc., 170 P.3d 832, 835-36 (Colo.App.2007).
Therefore, we conclude that the evidence of the polygraph examinations should not have been admitted, and the trial court should not have listened to, or considered, the opinions of any experts based, in whole or in part, on the polygraphs.

*1251 B. Prejudice
The next question is whether the admission of the polygraph evidence prejudiced father. We conclude it did and that reversal is required.
To put the matter in context, we summarize the salient facts detailed above. As early as February 2007, supervised family visits with both parents and both children in the home had commenced with considerable success. Unsupervised and overnight visits in the residence were being contemplated. The purpose of these visits was to commence reuniting the family, which, at the time, was the goal of the treatment plan and the proceedings. According to the caseworker, the daughter made her allegations in February 2007. At the time of the allegations, father had not had unsupervised visitation with the daughter since she was removed from the home in September 2005, at the age of two.
An investigation into the allegations concluded they were unfounded; these conclusions were reported to the caseworker as early as March 9, 2007, and the caseworker apparently accepted them as accurate, but did not pass them on to the treatment specialists. In her March 14, 2007 report to the court, the caseworker stated that father was being scheduled for a "domestic violence polygraph." The first polygraph, which dealt exclusively with specific allegations of sexual misconduct, was administered April 17, 2007, and the operator concluded father was deceptive. After the first polygraph, father's participation in the family visitations was terminated, and he was allowed one-hour supervised visitations once a week.
An almost identical polygraph was administered on July 11, 2007, with similar results. Father's individual therapist, who scheduled the polygraphs and apparently embarked on a "sex offender" treatment plan, was not aware that the daughter's allegations were determined to be "unfounded" until his cross-examination at the termination hearing. However, he also testified that he was not influenced by the facts, but only by his experience, in classifying father as a "denier" as a result of the first polygraph, despite his testimony that the polygraph's accuracy under these circumstances was no greater than 50-50. From the record, it is apparent that father's classification as a "denier" by his therapist was premised on his having been "deceptive" on a polygraph, with no better than a 50-50 accuracy, in denying the "unfounded" allegations made by his daughter. And, finally, father's therapist testified that the treatment professionals would have raised no objection to unsupervised visitation if father had passed the first polygraph. Father's therapist testified that he would not release father from the domestic violence program until he revealed the information which was causing him to be deceptive in the polygraph examination by, among other things, passing the polygraph.
The first polygraph was administered April 17, 2007, the motion to terminate was filed May 4, 2007, at which time the primary goal was to reunite the family, and the first polygraph was filed with the trial court on May 7, 2007. It is difficult to conclude those events were not connected. Father remained in supervised visitations for one hour each week through the termination hearing, a situation which would make it virtually impossible for him to succeed at the hearing, especially in light of the time restraints and the opinion of his individual therapist.
Therefore, as a direct result of the first polygraph, the permanency plan was modified, the treatment plan was not modified, and father was relegated to a single one-hour supervised visitation a week with the children. At the termination hearing, the supervisors and therapists could not, or would not, recommend any unsupervised visitation for father because of the unresolved issues raised by the polygraph, which, for all practical purposes, foreclosed any chance of father maintaining a parent-child relationship with either child. For the most part, all the other expert witnesses deferred to father's individual therapist, who had been operating outside the treatment plan for several months based on an unfounded allegation.
Under these circumstances, one cannot conclude that father was not prejudiced by the use of the polygraphs and the admission into evidence of the results of the polygraphs or the opinions based on those results. *1252 Here, as we previously stated, the polygraph evidence consumed the trial and supplanted the treatment plan. Most important, decisions were made by the caseworker and treatment professionals in early 2007 based solely on the polygraph.

C. The Trial Court's Conclusions
In its oral and written conclusions, the trial court assured the parties and this court that it was not relying on any sexual misconduct or polygraph evidence in finding that father was unfit and was unlikely to become fit in a reasonable time. While we applaud the trial court's effort to separate out the inadmissible evidence, we conclude that it could not be done.
The trial court relied on testimony that, while father had completed his domestic violence program "on paper," he had not "internalized" what he had been taught. It is important to note here that (1) the domestic violence program was undertaken because of indications of domestic violence between father and the mother; (2) they lived together during the entire proceeding until shortly after father failed to pass the second polygraph; (3) they were in therapy and counseling programs throughout the proceeding; and (4) there was not one reported, or suspected, episode of domestic violence or threat of domestic violence. There was never any allegation of domestic violence involving the children occurring before or during the proceeding. There was no evidence that father acted violently, or threatened any violence, toward any other person throughout the proceeding.
The therapists related two events regarding father's choice to remain angry or frustrated with the process, or some aspect of the process. The first instance occurred early and involved a visitation, and the second involved the deterioration of his participation in the domestic violence program following the second polygraph. On both occasions, father consciously declined to implement the coping skills he had been taught. And, of course, the latter occasion was the direct and proximate result of the polygraph.
Finally, all the experts testified that they did not recommend, and could not recommend, unsupervised visitation for father after April 2007 because of the polygraph. Those who gave recommendations based on father's failure to "internalize" his anger coping skills also included his failure to pass the polygraphs as grounds for not recommending unsupervised visitation, without testifying that the former basis was sufficient unto itself. Significantly, not one therapist or caseworker testified that father was an unfit parent, and unlikely to become fit within a reasonable time, solely based on his failure to "internalize" the anger coping skills. Instead, the consistent theme of the testimony was that prior to the first polygraph he could have had unsupervised visitation, but after, he could not be released from treatment for domestic violence unless and until he disclosed that which caused the deceptive results on the polygraph, which could only be verified by passing the polygraph.
Inadmissible evidence of polygraph examinations formed the basis for the opinions and recommendations from all of the expert witnesses that father's parental rights should be terminated. The polygraph evidence was inextricably intertwined with, and formed the predicate for, the testimony concerning father's failure to "internalize" his anger management therapy. Thus, we conclude there was insufficient admissible evidence to support a finding, by clear and convincing evidence, that father was an unfit parent.
Therefore, the judgment terminating father's parental rights must be vacated and this case remanded for further proceedings consistent with the views expressed in this opinion.
Judge BERNARD and Judge MÁRQUEZ[*] concur.
NOTES
[*] Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S.2008.