COLORADO COURT OF APPEALS　　　　　　　　　2016COA183

Court of Appeals No. 16CA0780
Arapahoe County District Court No. 15JV1163
Honorable Bonnie McLean, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of G.E.S., Child,

and Concerning G.S.,

Respondent-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE J. JONES
Graham and Miller, JJ., concur

Announced December 15, 2016

Ron Carl, County Attorney, Marilee M. McWilliams, Senior County Attorney, Aurora, Colorado, for Petitioner-Appellee

Ranee Sharshel, Alison A. Bettenberg, Guardians Ad Litem

Pickard & Ross, P.C., Joe Pickard, Justin Ross, Kerry Simpson, Littleton, Colorado, for Respondent-Appellant

¶ 1     G.S. (father) appeals the judgment adjudicating his daughter, G.E.S., dependent and neglected and adopting a treatment plan for him. Because we conclude that the district court erred in admitting unduly prejudicial testimony regarding polygraph examinations, we reverse the judgment adjudicating the child dependent and neglected as well as the related dispositional order adopting a treatment plan, and remand the case for a new trial.

## I.  Background

¶ 2     In May 2015, father's then twelve-year-old stepdaughter, J.O-E., told her therapist that father had made her uncomfortable by talking about inappropriate things and touching her inappropriately. The therapist called the police and the Arapahoe County Department of Human Services (department).

¶ 3     An intake caseworker from the department immediately went to meet with the child at the therapist's office, and the child made similar statements to the caseworker. The child then participated in a recorded forensic interview. She said that father had touched both her vaginal area and her breasts and had talked to her about sexual things.

¶ 4     Shortly thereafter, however, the child told her mother that her statements about father sexually abusing her were untrue. The child met with a police detective and, in another recorded interview, recanted her prior statements that father had acted inappropriately toward her. The police closed their case.

¶ 5     In the meantime, the family voluntarily cooperated with the department and followed the department's recommended safety plan. As part of the plan, father left the family home and had no contact with his infant child (G.E.S.) or any of his three stepchildren. The department also asked him to complete a psychosexual evaluation and disclose the results to the department. Father agreed to do the evaluation and completed it after a few months. The evaluator recommended that father undergo a polygraph examination, but father declined.

¶ 6     Although the child had recanted, the department believed the child's original statements about sexual abuse by father. Explaining that father's unwillingness to undergo the recommended polygraph examination prevented the case from moving forward voluntarily, the department filed a dependency and neglect petition as to G.E.S.

¶ 7     Father denied the petition's allegations and requested a jury trial.  At trial, the department sought to prove that G.E.S. was dependent and neglected because:

- the parent subjected the child to mistreatment or abuse or had suffered or allowed another to mistreat or abuse the child without taking lawful means to stop such mistreatment or abuse and prevent it from recurring;

- the child lacked proper parental care through the acts or omissions of the parent;

- the child's environment was injurious to her welfare; and

- the parent failed or refused to provide proper or necessary subsistence, education, medical care, or any other care necessary for the child's health, guidance, or well-being.

See § 19-3-102(1)(a)-(d), C.R.S. 2016.

¶ 8     The department argued that this was a prospective harm case. See People in Interest of D.L.R., 638 P.2d 39, 43 (Colo. 1981) (the statutory grounds for dependency and neglect can be satisfied by showing prospective harm to the child).  Its theory was that G.E.S. was at risk in the future because father had sexually abused his

3

stepdaughter and had not cooperated with the department in attempting to assess the safety of the home. *See People in Interest of S.N.*, 2014 COA 116, ¶¶ 16-17 ("[T]o determine whether a child is dependent and neglected based on prospective harm, it must be determined whether it is likely or expected that the child will lack proper parental care through the actions or omissions of the parent . . . . Prospective harm thus requires a prediction of whether, based on the parent's past conduct and current circumstances, it is likely or expected that the parent will fail to provide proper care for the child in the future.") (citation omitted).

¶ 9     The court presented the jurors with a special verdict form, which asked the following questions:

> Question 1: Did [father] mistreat or abuse [G.E.S.] or tolerate or allow another person to mistreat or abuse [G.E.S.] without taking lawful means to stop such mistreatment or abuse and prevent it from being repeated?
>
> Question 2: Is [G.E.S.] lacking proper parental care as a result of [father]'s acts or failures to act?
>
> Question 3: Is [G.E.S.]'s environment injurious to her welfare as a result of [father]'s acts or failure[s] to acts?

> Question 4: Did [father] fail or refuse to provide proper or necessary subsistence, education, medical care or any other care necessary for [G.E.S.]'s health, guidance, or well-being?

¶ 10    The jury answered "Yes" to the first three questions but "No" to the fourth.

¶ 11    After the jury returned its verdict, the court entered judgment adjudicating G.E.S. dependent and neglected. The court then held a dispositional hearing at which father agreed to the department's proposed treatment plan. The court adopted that plan.

## II.  Father's Contentions

¶ 12    Father contends that the jury's verdicts should be reversed because the district court erred in admitting evidence that he underwent a psychosexual evaluation, refused to undergo a polygraph examination, and later underwent a polygraph examination but did not tell the department. He also contends that the court erred in admitting the child's hearsay statements about sexual abuse without the child testifying. We agree with father that the court erred in admitting evidence that he had taken a psychosexual evaluation and in admitting polygraph evidence. Because these errors were not harmless, we reverse.

## A. Psychosexual Evaluation and Polygraph Evidence

### 1. Law

¶ 13    The purpose of an adjudicatory trial is to determine whether the factual allegations in the dependency and neglect petition are supported by a preponderance of the evidence, and whether the status of the subject child warrants intrusive protective or corrective state intervention into the familial relationship. *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

¶ 14    Before an adjudication, the court may issue temporary orders providing for the child's custody, protection, support, medical evaluation or medical treatment, surgical treatment, psychological evaluation or psychological treatment, or dental treatment as it deems in the child's best interests. § 19-1-104(3)(a), C.R.S. 2016. And, parents may voluntarily work with the department to alleviate any child welfare concerns. *See, e.g.*, § 19-3-308.3(2), C.R.S. 2016 (creating a differential response program in which the family may voluntarily participate); § 19-3-501(1)(c), C.R.S. 2016 (allowing informal adjustment without the filing of a dependency and neglect petition with the consent of the parents); *People in Interest of L.B.*, 254 P.3d 1203, 1205 (Colo. App. 2011). But, a parent need not

cooperate with the department's efforts to investigate the factual allegations supporting the petition. *See, e.g., E.S.V. v. People*, 2016 CO 40, ¶ 5. Rather, it is the department's burden to prove, by a preponderance of the evidence, the petition's allegations. § 19-3-505(1), C.R.S. 2016; *People in Interest of S.N.*, 2014 CO 64, ¶ 9.

¶ 15 Because a dependency and neglect proceeding is preventative as well as remedial, an adjudication may be based not only on current or past harm but also on prospective harm. *D.L.R.*, 638 P.2d at 43. The fact finder may properly consider the treatment accorded other children in determining whether the child at issue is dependent and neglected. *Id.* at 42.

¶ 16 Evidence of polygraph test results are per se inadmissible at an adjudicatory trial because they are not reliable. *People in Interest of M.M.*, 215 P.3d 1237, 1248 (Colo. App. 2009). Such evidence presents a "serious risk" of unfair prejudice and misleading the jury, and "there is an inherent danger that a jury will rely too heavily" on such evidence. *People v. Anderson*, 637 P.2d 354, 361 (Colo. 1981). The prohibition of polygraph evidence extends to expert opinions, based in whole or in part, on polygraphs. *M.M.*, 215 P.3d at 1250.

¶ 17    Nonetheless, a mere reference to polygraph testing does not require reversal. *Bloom v. People*, 185 P.3d 797, 806 (Colo. 2008); *People v. Banks*, 2012 COA 157, ¶¶ 89-96, *rev'd on other grounds sub nom. People v. Tate*, 2015 CO 42, ¶¶ 61-62. Reversal is required when the admission of such evidence prejudices a parent. *M.M.*, 215 P.3d at 1251-52. This occurs when the inadmissible polygraph evidence becomes inseparable from the admissible evidence. *Id.* at 1252.

## 2. The Evidence Presented at Trial

¶ 18    Before trial, father filed a motion in limine asking the court to exclude any evidence related to his psychosexual evaluation and any reference to his refusal to participate in a polygraph examination. Both the department and the guardian ad litem (GAL) argued that psychosexual evaluations are a tool used by caseworkers to assess safety and are part of the department's evaluative process and thus relevant to explain the department's involvement. The GAL said that the psychosexual evaluator recommended that father participate in an instant offense polygraph examination, and the department characterized the polygraph examination as part of the evaluation process.

¶ 19    The GAL also argued that father's failure to undergo a polygraph examination was relevant to show father's lack of cooperation, and that his lack of cooperation was relevant to the petition's allegations of mistreatment, abuse, and injurious environment.

¶ 20    Father argued that polygraph evidence is unreliable and therefore usually per se inadmissible. He continued that any relevance of the psychosexual evaluation and the subsequent recommendation for a polygraph examination would be overly prejudicial and would confuse the jurors. He explained that, to the extent that the evidence's asserted relevance was to show that he did not cooperate with the department, this evidence would unfairly prejudice him because it would lead to an implication that he had declined to take the polygraph examination because he had committed the alleged sexual abuse.

¶ 21    The court was persuaded that the evaluation and the polygraph refusal were part of the evaluative process to determine the safety of the children. The court ruled that the probative value of this evidence outweighed its prejudicial effect and thus allowed evidence that father had taken the psychosexual evaluation and

had declined to take the polygraph. The court made clear that evidence of the results of the psychosexual evaluation would not be admissible and noted that, because father did not take a polygraph examination, there was no issue as to the results of such an examination.

¶ 22 During its presentation of evidence, the department offered the testimony of the intake caseworker about the psychosexual evaluation and the polygraph. She testified that she thought the child's initial statements were credible because the child was matter of fact and was able to provide details. Because the intake caseworker felt the child's statements were credible, she believed that the family was in need of services and that the department should continue to investigate its child protection concerns.

¶ 23 She told the jury that to assess for safety, the department asked father to complete a psychosexual evaluation and a polygraph. She described the evaluation and the polygraph to the jury as "an assessment tool that's used to determine if there is any risk for future maltreatment," specifically, future sexual abuse. She agreed that the evaluation and polygraph were necessary to finish the assessment of the child's safety. Both the intake caseworker

and the permanency caseworker testified that father completed the psychosexual evaluation, but had not completed a polygraph examination. The permanency caseworker testified that because father did not complete the polygraph examination, he did not complete the assessment process.

¶ 24 The department also presented an expert in sexual abuse. She reiterated that when there is an allegation of inappropriate touching, a psychosexual evaluation is typically requested to determine the risk of future inappropriate behavior and that completing the entire evaluation is important.

¶ 25 Father presented his own expert on sexual abuse and child protection. That witness agreed that when there is an allegation of sexual abuse, there is an evaluation that social services departments use to assess safety. And, he agreed that a good clinician collects as much information as possible in assessing outcries of sexual abuse. But, he also testified that sexual abuse cannot be diagnosed.

¶ 26 Father then testified. Before his cross-examination began, father's counsel alerted the court to a further fact — namely, that father had completed a polygraph examination privately, the results

11

of which father had not provided to the department. Father's counsel asked the court to prohibit the department from inquiring during cross-examination as to whether father had taken a polygraph. Counsel reasoned that if the jurors learned that father had taken a polygraph examination, but had not provided the results to the department, they would presume that the examination results were not favorable to father, which would amount to inappropriately admitting the polygraph results. The court ruled that the department could ask father whether he had taken a polygraph examination and could follow up by asking father whether he had "turned it over" to the department, but reiterated that polygraph results were not admissible.[1]

### 3. Polygraph Evidence

¶ 27 Father contends that the court erred in admitting any references to a polygraph. He argues that, in allowing witnesses to testify that he had refused to take a polygraph examination and in allowing the department to ask him whether he had turned over the results of the polygraph examination he did take to the department,

---

[1] In light of this ruling, father's attorney asked him about the polygraph on direct examination.

the court allowed jurors to infer that, in the case of the former, he believed that taking an examination would reveal that he had sexually abused his stepdaughter and, in the case of the latter, that the results were unfavorable to him.  We agree.

¶ 28     A typical juror would have viewed the polygraph evidence as tending to show that father had abused his stepdaughter.  Because the credibility of stepdaughter's initial report was the central issue in the case, we conclude that it is unlikely in the extreme that the jurors would not have used the evidence as bearing on that question.  And although no polygraph results per se were related to the jury, the implications that father feared taking a polygraph examination and had "failed" the examination he ultimately took were unmistakable.  And admitting polygraph results by implication is not substantially different from actually admitting results.  *See, e.g., M.M.*, 215 P.3d at 1250 (expert opinions that were formed by relying on polygraph results renders the expert's testimony inadmissible because the basis of the opinion is unreliable).  Therefore, we agree that the district court erred in allowing this testimony.

#### 4. Prejudicial Implication that Father Feared or Failed the Polygraph

¶ 29    But this does not end the analysis. We must also determine whether the admission of the evidence prejudiced father. *See id.* at 1251-52. We conclude that the implications that father feared taking a polygraph and failed the polygraph are inseparable from the other evidence and that insufficient admissible evidence untainted by the implication of the polygraph evidence remains.

¶ 30    The department advanced two theories as to why G.E.S. was dependent and neglected. First, the department alleged that father had sexually abused the stepdaughter, placing G.E.S. at risk for sexual abuse. As noted, the admission of the evidence suggesting that father feared a polygraph and had failed the polygraph could have made it more likely in the jurors' minds that he had sexually abused the stepdaughter.

¶ 31    We acknowledge that the jurors viewed the stepdaughter's forensic interview in which she made the sexual abuse allegations, and also viewed her recorded interview with the police later recanting her allegations and could have assessed the credibility of the two statements for itself. But, we cannot say that the jurors'

determination was free of improper consideration of the polygraph given the evidence the department presented to support the child's initial outcry. The department's position was that the child's initial outcry was "credible." The department's expert witnesses opined that the initial outcry was credible and gave details on why those specific statements should be believed. The department also asked its sex abuse expert, "[D]o you have any concerns about the credibility of the outcry?" The expert replied, "I do not." *See* CRE 608(a); *People v. Eppens*, 979 P.2d 14, 17-18 (Colo. 1999) (witnesses are not permitted to offer opinions that a child was telling the truth on the specific occasion that the child reported sexual abuse); *People v. Cernazanu*, 2015 COA 122, ¶¶ 11-22 (same).[2]

¶ 32    The department's experts also testified about why a child might recant an allegation of sexual abuse. The department's sex abuse expert explained that recantation is "completely understandable." She related that child abuse victims are under

---

[2] Given that this court and the supreme court have long held that a witness may not vouch for the credibility of another witness on a particular occasion, the admission of the vouching testimony by the department's witnesses was obviously erroneous. Allowing such testimony is so prejudicial that a court should step in and disallow it notwithstanding the absence of an objection.

pressure — caught between wanting their abuse to stop and wanting their family to stay together. She elaborated that once there is an outcry and a family member is removed, there is a burden of guilt, fear of what will happen next, and fear of being ostracized from the family, all of which pressure the victim who made the disclosure. The permanency caseworker expressed concern that the stepdaughter felt guilty about father having to leave the home and that there were some indications that her siblings knew father was out of the home because of her.

¶ 33    In explaining why victims recant, the experts told the jurors that recantations almost never occur because the allegations are false. Rather, the department's sexual abuse expert explained that the rate of false allegations of sex abuse "is really very small," and noted that it was between two and eight percent.

¶ 34    Given the inherently prejudicial nature of the polygraph evidence, and the lack of otherwise admissible evidence overwhelmingly proving the allegations of dependency and neglect, the erroneous admission of the polygraph evidence was not harmless. Indeed, the prejudice to father was only increased by the

testimony of several witnesses improperly vouching for the victim's credibility (at least with respect to her initial allegations).

5.  Prejudicial Implications Related to Father's Level of Cooperation

¶ 35    We are also concerned about the prejudice surrounding the department's second theory as to why G.E.S. was dependent and neglected: that she was at risk because father failed to cooperate with the department's evaluative process because he did not complete both the psychosexual evaluation and the polygraph.  In relation to this theory, father contends that the court erred in admitting any testimony of a polygraph because such evidence is per se not relevant to the adjudicatory proceedings.  He also objects to admitted expert testimony regarding the necessity for a polygraph and father's refusal to provide one.  For similar reasons, he contends that the court erred in admitting evidence that he participated in a psychosexual evaluation due to its irrelevance and unfair prejudice.  Under the circumstances here, we are persuaded that the prejudicial impact of the polygraph evidence, together with the prejudice flowing from evidence of his partial cooperation with the department's request that he complete its evaluative processes, also dictate reversal.

17

¶ 36    Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. But even relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403. In evaluating the evidence's probative value, the "court should consider the logical force of the evidence and the proponent's need for the evidence." *Martin v. People*, 738 P.2d 789, 794 (Colo. 1987).

¶ 37    Father voluntarily agreed to take the psychosexual evaluation. The permanency caseworker's testimony made clear that no treatment plan had been adopted, and the department was not in the treatment phase of the case because there had been no adjudication. She also noted that father's participation was on a voluntary basis. There was no indication that father was not within his rights to refuse the department's requests that he cooperate with its evaluative process. Even assuming the psychosexual evaluation and polygraph were necessary for the department to

assess the potential threat to the child as part of its normal evaluative process, we are not persuaded that the department may then use a refusal to complete the voluntary evaluative process to show that the child was dependent and neglected.

¶ 38    Under the Children's Code, father had no duty to cooperate by completing a psychosexual evaluation and polygraph.  The probative value of telling the jurors that the department needed to continue to evaluate the safety of the home was low because no department witness testified that they were uncertain of the truthfulness of the stepdaughter's outcry.  As noted above, the department's witnesses characterized the stepdaughter's outcry as "credible."

¶ 39    Because the department believed the outcry, we disagree with the district court that the probative value of father's willingness to cooperate with the psychosexual evaluation and of the polygraph evidence outweighed the evidence's prejudicial effect.  Given the department's position that the stepdaughter's initial outcry was truthful, evidence of its need for further investigation related to the sexual abuse allegations could have been confusing to the jury.  At a minimum, evidence of father's failure to complete the evaluative

process leads to the prejudicial implication that he failed to complete the process because he had sexually abused the stepdaughter and was attempting to evade further inquiry.

¶ 40    We also observe that allowing this type of evidence at an adjudicatory proceeding places a parent between a rock and a hard place.  As discussed, participating in the psychosexual evaluation and polygraph at this stage is purely voluntary.  But if evidence of refusal is admissible, the parent must choose between, on the one hand, participating in a test that, in the case of the psychosexual evaluation, is designed for persons who have been found to have engaged in sexual abuse, and, in the case of a polygraph, is unreliable or, on the other hand, refusing to participate and having that refusal used against him as "lack of cooperation."

¶ 41    That father was under no obligation to complete a psychosexual evaluation or undergo a polygraph examination distinguishes this case from *People in Interest of L.K.*, 2016 COA 112 (*cert. granted* Nov. 7, 2016).  In that case, a treatment plan required the father to participate in sex offender treatment and take a polygraph examination, so his refusal could be used to support

termination of his parental rights based on failure of the treatment plan.

¶ 42    In short, we are convinced that the prejudice of this evidence, together with the implication that father feared and failed a polygraph, dictates that the judgment should be reversed.

¶ 43    Having concluded that the court should not have allowed evidence of father's participation in the psychosexual evaluation or of a polygraph to be presented to the jury because of its prejudicial impact, we need not address father's contentions that the evidence should not have been admitted based on his due process rights, attorney-client privilege, and CRE 408.

## B.  The Child's Hearsay Statements

¶ 44    Because it may arise on remand, we address, and reject, father's last contention that the court erred in admitting the child's hearsay statements.

### 1.  Law

¶ 45    Section 13-25-129(1), C.R.S. 2016, authorizes the admission of an out-of-court statement made by a child describing an unlawful sexual offense, which would otherwise not be admissible. Such statements are admissible if the court determines that (1) the

time, content, and circumstances of the statements provide sufficient safeguards of reliability; and (2) the child either testifies at trial or is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statements. *Id.*

¶ 46 In criminal cases, the Sixth Amendment and its associated right to confront witnesses require that out-of-court testimonial statements be subject to cross-examination before being admitted. *See People in Interest of R.A.S.*, 111 P.3d 487, 490 (Colo. App. 2004) (holding that the admission of an unavailable child's forensic interview violated a juvenile's Sixth Amendment right to confrontation in a delinquency case). But, a division of this court has held that due process does not necessitate extension of the Sixth Amendment's right to confront witnesses to litigants in dependency and neglect cases. *People in Interest of S.X.M.*, 271 P.3d 1124, 1127 (Colo. App. 2011). And, the potential traumatic impact of a child victim's giving testimony of sexual abuse may form the basis of a finding of unavailability if the child's emotional or psychological health would be substantially impaired if the child was forced to testify. *People v. Diefenderfer*, 784 P.2d 741, 750 (Colo. 1989).

¶ 47    We review the admission of child hearsay statements for an abuse of discretion. *People v. Phillips*, 2012 COA 176, ¶ 63. The district court does not err in finding that a child is unavailable to testify if adequate evidence in the record supports that finding. *Diefenderfer*, 784 P.2d at 748, 751.

## 2. District Court's Order

¶ 48    In its order allowing the child's hearsay statements to be admitted, the court recounted the child's therapist's testimony that the child's mental and emotional health would be gravely endangered if the child testified. The court ruled that if the child's mental health on the date of trial was the same as at the time of the pretrial evidentiary hearing, she would be deemed unavailable to testify. The court also ruled that there was corroborative evidence of the act which was the subject of the statements, and that the right of confrontation does not extend to litigants in a dependency and neglect case.

## 3. Discussion

¶ 49    Adequate evidence from the pretrial hearing supports the court's finding that the child was unavailable to testify. The child's then-current therapist testified that the child had difficulty

23

regulating her emotions and "can quickly move to a very low place." The child's former therapist said that the child had been hospitalized because of suicidal threats and had engaged in other self-harming behavior in the past. The then-current therapist said that the child felt a lot of pressure and responsibility for separating the family. She believed that testifying would be harmful for the child because it would increase the pressure she felt, which would lead to increased difficulty regulating her emotions and increased suicidality. She explained that, even within the safe space of therapy, the child did not feel comfortable talking about the allegations. On the first day of trial, the parties agreed that the child's therapist had not changed her opinion about the child testifying.

¶ 50 On appeal, father does not challenge the court's findings that the time, content, and circumstances of the statements provide sufficient safeguards of reliability and that corroborative evidence supported the child's statements. We agree with the district court that the Sixth Amendment's Confrontation Clause does not extend to dependency and neglect cases, and the record supports the court's finding that the child was unavailable to testify because

testifying would gravely harm her mental and emotional health. Thus, we conclude the court did not abuse its discretion in admitting the child's statements without the child testifying at trial. *See Phillips*, ¶ 63.

## III.  Conclusion

¶ 51     The judgment adjudicating the child dependent and neglected and entering a dispositional order is reversed.  The case is remanded for a new trial.

JUDGE GRAHAM and JUDGE MILLER concur.

25