24CA0370 Peo in Interest of M-VO-G 09-26-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0370
Montrose County District Court No. 23JV30022
Honorable D. Cory Jackson, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of M-V.O-G., a Child,

and Concerning O.O. and M.L.O.,

Appellants.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 26, 2024

---

Martha Phillips Whitmore, County Attorney, Julie R. Andress, Deputy County Attorney, Montrose, Colorado, for Appellee

Robert G. Tweedell, Guardian Ad Litem

Padilla Law, P.C., Beth Padilla, Durango, Colorado, for Appellant O.O.

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant M.L.O.

¶ 1     M.L.O. (mother) and O.O. (father) appeal the judgment adjudicating M-V.O-G. (the child) dependent and neglected. We affirm the adjudication, but we reverse the disposition and remand the case to the juvenile court to ensure compliance with the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963, and Colorado's ICWA statute, § 19-1-126, C.R.S. 2024.

## I.     Background

¶ 2     In August 2023, the Montrose County Department of Human Services filed a petition in dependency and neglect, alleging, among other things, that mother tested positive for methamphetamine while at the hospital giving birth to the child and struggled with mental health issues. As for father, the Department alleged, among other things, that he demonstrated "erratic behavior at the hospital" and had "a child welfare history . . . wherein [he] was not compliant with his treatment plan, specifically substance abuse services."

¶ 3     The parents denied the allegations in the petition and asked for a jury trial to resolve whether the child should be adjudicated dependent or neglected. At the trial, the Department asserted that the child was dependent or neglected under section 19-3-102(1)(c), C.R.S. 2024, which provides that a child is dependent or neglected

if "[t]he child's environment is injurious to his or her welfare." After hearing the evidence, the jury returned a verdict in the Department's favor. Based on the jury's verdict, the juvenile court adjudicated the child dependent and neglected as to both parents and adopted treatment plans for them.

## II. Indian Child Welfare Act

¶ 4 Mother first asserts that the juvenile court erred because it did not ensure that the Department exercised due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child, as required by section 19-1-126(3). Because the court did not make adequate findings prior to or at the dispositional hearing, we reverse the disposition and remand the case for further proceedings. *See People in Interest of M.V.*, 2018 COA 163, ¶ 35 (noting that a dispositional hearing is a child custody proceeding under ICWA, but an adjudicatory hearing is not), *overruled on other grounds by People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42.

¶ 5 For ICWA to apply in a dependency or neglect proceeding, the case must involve an Indian child. *See People in Interest of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995); *see also* 25 U.S.C. § 1903(4)

(defining "Indian child" as "any unmarried person who is under age eighteen" and (1) "a member of an Indian tribe," or (2) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe").  To ascertain whether the case involves an Indian child, a juvenile court must inquire of the parties whether they know or have reason to know that the child is an Indian child. § 19-1-126(1)(a)(I)(A).  A mere assertion of potential Indian heritage, without more, is insufficient to give the court reason to know that the child is an Indian child.  *E.A.M.*, ¶ 56.

¶ 6     If the juvenile court does not have reason to know but has information that "the child may have Indian heritage," then the court must direct a department to "exercise due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child."  § 19-1-126(3); *see also H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5.  Section 19-1-126(3) provides a flexible standard that does not require the department to "succeed in its efforts" or "exhaust every possible option in attempting to do so." *H.J.B.*, ¶ 58.  Whether the department satisfied its due diligence obligation is left to the court's sound discretion.  *Id.*

¶ 7     At an initial advisement hearing in August 2023, the juvenile court asked mother whether she had any Native heritage.  Mother stated that her aunt was an enrolled member of a Cherokee tribe.  The court then provided mother with an ICWA assessment form and asked her to complete it, including any information about her Native heritage.

¶ 8     About a month later, mother filed with the juvenile court a completed ICWA assessment form, but she did not serve the Department with the form.  For reasons unknown, the form listed two of mother's older children and their father, none of whom were subject to these proceedings, rather than the child or father involved in this case.  The form asserted Southern Ute and Ojibwe heritage for the identified children but only through their father.  But the form asserted mother had Cherokee and Choctaw heritage and was "a member of a tribe or believed to be eligible for membership in one or more tribes."  Mother signed the ICWA assessment form before filing it.

¶ 9     Apparently believing that mother had not returned the ICWA assessment form, the Department requested a hearing "for the purpose of gathering information regarding ICWA."  At the hearing,

mother testified that she did not have any Native heritage other than Cherokee. Neither the court nor the parties asked mother specifically about her prior written disclosure of Choctaw heritage. The Department sent notices to the three Cherokee tribes; all three tribes responded that the child was not a member or eligible for membership. No ICWA notices were sent to the Choctaw tribe(s). The juvenile court did not subsequently make any ICWA findings or determine whether the Department had exercised due diligence under section 19-1-126(3).

¶ 10 On appeal, mother concedes that the juvenile court did not have reason to know that the child was an Indian child, but she maintains that the Department failed to exercise due diligence under section 19-1-126(3) by not investigating mother's assertion that the child had Southern Ute, Ojibwe, or Choctaw heritage. She further asserts that we should remand the case for the court to make findings on whether the Department exercised due diligence.

¶ 11 If section 19-1-126(3) applies, then "the juvenile court must determine (1) whether the petitioning party satisfied its statutory due diligence requirements and (2) whether the court now has reason to know that the child is an Indian child." *See H.J.B.,* ¶ 59.

But the juvenile court did not make these findings. Because these determinations require factual and credibility determinations, we cannot address them in the first instance on appeal. *See id.* at ¶ 58; *see also People in Interest of S.Z.S.*, 2022 COA 133, ¶ 21 (noting that appellate courts cannot make factual findings).

¶ 12    We must therefore reverse the disposition and remand the case to the juvenile court. *See M.V.*, ¶ 35. On remand, the court must direct the Department to make a record of its efforts to determine whether the child has Choctaw heritage[1] and determine whether the record establishes that the Department exercised due diligence under section 19-1-126(3). *See H.J.B.*, ¶ 59. The court must then determine whether there is reason to know that the child is an Indian child and if ICWA therefore applies. *See id.*

---

[1] While mother argues on appeal that the juvenile court erred by not excluding Southern Ute, Ojibwe, and Choctaw heritage, she fails to provide record support for the contention that she disclosed that this child potentially has Southern Ute or Ojibwe heritage (as opposed to the two older children who are not parties to this case). Thus, absent additional or supplemental disclosures regarding the children's heritage (whether Southern Ute or Ojibwe), on remand the juvenile court need only address whether the Department exercised due diligence to determine whether the child is an Indian child based on potential Choctaw heritage.

### III.  Sufficiency of the Evidence

¶ 13    Mother and father each contend that the evidence was insufficient to support the jury's verdict that the child was dependent and neglected as to them under section 19-3-102(1)(c). We disagree.

¶ 14    In determining whether the evidence is sufficient to sustain an adjudication of dependency or neglect, we review the record in the light most favorable to the prevailing party, and we draw every inference "fairly deducible" from the evidence in favor of the jury's decision.  *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).  The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the purview of the jury.  *Id.*  We will not disturb the jury's findings if the record supports them, even if reasonable people might arrive at different conclusions based on the same facts.  *Id.*; *People in Interest of T.T.*, 128 P.3d 328, 331 (Colo. App. 2005).

### A.  Mother's Sufficiency Challenge

¶ 15    To begin, mother asserts that the evidence was insufficient to establish that the child was in an injurious environment because

the Department did not present any evidence that she was currently using substances. However, an adjudication may be based not only on current harm, but also on prospective harm. *S.G.L.*, 214 P.3d at 583. To find that a child is dependent or neglected based on prospective harm, the fact finder may consider a parent's past treatment of another child and material facts about a parent's conduct or condition, including the parent's past drug use. *People in Interest of S.N.*, 2014 COA 116, ¶¶ 18-19; *see also People in Interest of D.L.R.*, 638 P.2d 39, 42 (Colo. 1981) ("[I]t has been held repeatedly that the trial court may properly consider the treatment accorded other children in determining whether the child before it is neglected [or] dependent.").

¶ 16     The fact finder must also holistically evaluate a parent's past conduct and current condition:

> But, in a case-by-case analysis, facts about a parent's past care of other children, or facts about a parent's condition or conduct, may or may not be dispositive in determining whether it is likely or expected that a child will be dependent [or] neglected in the parent's care in the future. This is because, to prove the statutory criteria for dependency [or] neglect, the Department could bring a case based on one or multiple facts relating to a parent's past care, condition, conduct, or other

8

> circumstances. And, the probative value of each fact will vary by case; in some cases, one fact might be sufficient and, in others, even multiple facts might not be sufficient.

*S.N.*, ¶ 19

¶ 17    In the present case, the Department presented evidence that (1) mother and an older child tested positive for methamphetamine in an earlier dependency and neglect case; (2) mother acknowledged that she was using controlled substances shortly before the Department filed this case; and (3) mother went to inpatient treatment in the past but had not successfully completed her treatment. *See People in Interest of A.W.*, 2015 COA 144M, ¶ 22 ("Because [the child] had not been in mother's care, the jury was required to determine whether [the child] was dependent [or] neglected based on a prediction of the home environment to which [the child] might be exposed if she were placed in mother's care."); *see also D.L.R.*, 638 P.3d at 42 (noting that dependency and neglect cases are "preventative as well as remedial" and therefore a child need not be placed with a parent to determine "that harm would be done to the child").

¶ 18    The Department also presented evidence that mother had tested positive for methamphetamine only two months before the adjudication trial. Specifically, the Department produced a positive result from a hair follicle test. Mother asserts that this test was unreliable, considering that she had provide negative urinalysis (UA) results for several months leading up to the hair follicle test. But the jury heard testimony that the UA result only measured use within the previous seventy-two hours, while the hair follicle test measured use during the previous ninety days. In other words, the jury could infer from this evidence that mother was using drugs during the ninety days before the hair follicle test during periods that were not covered by the UA test results that did not show drug usage. *See S.G.L.*, 214 P.3d at 583.

¶ 19    Nor are we convinced by mother's assertion that the evidence was insufficient to support the jury's finding because nothing established that her mental health issues were likely to cause harm to the child. The record shows that the Department had significant concerns, as it did in mother's previous dependency and neglect cases, with mother experiencing significant difficulties in her "perception of reality." Mother believed things that did not correlate

with reality, such as her assertion that she had given birth to two children and the Department had stolen one of those children and she expressed various irrational and paranoid thoughts that the Department and her neighbor were operating a child trafficking ring. The caseworkers opined that mother's mental health concerns, which she had not successfully addressed during the previous cases, were a threat to the child's safety, especially considering that the child could not self-protect. In sum, there was sufficient evidence, as described above, for the jury to conclude that mother's mental health issues were likely to cause the child harm. *See People in Interest of J.G.*, 2016 CO 39, ¶ 26 (noting that a child is in an injurious environment "when a child is in a situation that is likely harmful to that child").

## B. Father's Sufficiency Contentions

¶ 20     Father contends the department failed to establish that his conduct placed the child in an injurious environment. For example, father argues that he complied with the requirements of his previous dependency and neglect case and there was no evidence that he used substances. However, father's contention runs afoul of our supreme court's precedent in *J.G.*

¶ 21     In *J.G.*, the supreme court interpreted section 19-3-102(1)(c) and held that the statute does not require the Department to prove either (1) parental fault or (2) "that both parents lack the availability, ability, and willingness to provide reasonable parental care." *J.G.*, ¶ 2.  Ultimately, whether a child is dependent or neglected under the injurious environment provision depends on "the *existence* of an injurious environment," not on "who caused it." *Id.* at ¶ 34.  In *People in Interest M.M.*, 2017 COA 144, ¶ 25, a division of this court applied the supreme court's ruling to conclude that a child could be adjudicated under the injurious environment provision with respect to one parent, even when the other parent created the injurious environment.

¶ 22     As described above, evidence of mother's substance abuse and mental health issues was sufficient to establish that the child was in an injurious environment.  The Department did not also need to present evidence that father's conduct had created an injurious environment.  *See J.G.*, ¶ 34; *M.M.*, ¶ 25.  Therefore, we reject father's assertion.

¶ 23     In any event, we agree with the Department and the guardian ad litem that there was also evidence in the record showing that the

child would be in an injurious environment based on father's conduct. For example, the jury heard evidence that mother had accused father of acts of domestic violence, which included claims that he had sexually assaulted her, forcibly injected her with drugs, and urinated on one of her other children. Moreover, father testified that he would allow mother to have contact with the child and that he did not believe that mother had substance use or mental health issues. And even though father later modified his testimony based on the evidence presented at the adjudicatory trial, it was within the jury's discretion to weigh and resolve father's testimony. *See People v. Poe*, 2012 COA 166, ¶ 14 (noting that it is the jury's role to resolve inconsistencies in the evidence and an appellate court cannot reweigh the evidence or the credibility of the witnesses).

¶ 24 Father also contends that some of the evidence relating to his conduct was outside the facts alleged in the petition, the Department never moved to amend the petition, and he did not have notice of those other allegations. We decline to address these contentions because father never raised them in the juvenile court. *See T.T.*, 128 P.3d at 331; *see also People in Interest of M.B.*, 2020

COA 13, ¶ 14 (noting that, in dependency and neglect cases, an appellate court addresses "only issues presented to and ruled on by the lower court"); § 19-3-505(4), C.R.S. 2024 ("When it appears that the evidence presented at the hearing discloses facts not alleged in the petition, the court may proceed immediately to consider the additional or different matters raised by the evidence if the parties consent.").

¶ 25    We also reject father's reliance on *S.G.L.*, to support his argument that a child may not be adjudicated dependent or neglected as to one parent based on the conduct of another parent. *See S.G.L.*, 214 P.3d at 580.  Even if we assume, without deciding, that this broad statement is consistent with *S.G.L.*, it is inconsistent with the subsequent supreme court decision in *J.G,* which, as previously noted, provides that an adjudication based on injurious environment relates to the status of the child rather than the actions of a particular parent.  We are bound by the supreme court's decision in *J.G.  See In re Estate of Ramstetter*, 2016 COA 81, ¶ 40 (noting that the Colorado Court of Appeals is bound by the opinions of the Colorado Supreme Court).

14

## IV. Reasonable Efforts

¶ 26    Last, father argues that the Department did not make reasonable efforts to prevent out-of-home placement and reunify him with the child. We disagree.

¶ 27    Typically, the issue of whether a department made reasonable efforts is raised in the context of a termination hearing, and more specifically, to address whether a department used reasonable efforts to provide a parent with services adequate to meet the objectives of the treatment plan. *See* § 19-3-604(2)(h), C.R.S. 2024 (stating that, in deciding whether a parent is unfit, the court "shall consider," among other things, whether "[r]easonable efforts by child-caring agencies . . . have been unable to rehabilitate the parent or parents"); *see also People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011) (noting that, in considering whether a department made reasonable efforts, the juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan).

¶ 28    In contrast, the purpose of an adjudicatory hearing is to determine the child's status as dependent or neglected under section 19-3-102 and whether that status warrants intervention by

15

the government.  *People in Interest of N.G.*, 2012 COA 131, ¶ 39; *see also K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006) (noting that the adjudication is not made as to the parents but relates to only the child's status).  Unlike a termination proceeding, before an adjudication enters, a parent has a presumption of fitness, *see N.G.*, ¶ 33, and the parent has no obligation to cooperate with the Department, *see People in Interest of G.E.S.*, 2016 COA 183, ¶ 14.  *See also People in Interest of T.W.*, 2022 COA 88M, ¶ 35 (an adjudication gives the juvenile court the authority to order compliance with a treatment plan).  Consequently, there is nothing in the Colorado Children's Code that requires the court to consider whether the Department made reasonable efforts to rehabilitate or reunify parents and children before it can enter an adjudication.

¶ 29     Father has not directed our attention to any statute or case law that requires the juvenile court to consider whether the Department made reasonable efforts before the court can enter an adjudication order.  Rather, he cites to *People in Interest of D.P.*, 160 P.3d 351, 355 (Colo. 2007), which involved a termination of parental rights under section 19-3-604(1)(c).  That case is therefore inapposite for the reasons described above.

¶ 30 That said, father's first argument — that the Department failed to make reasonable efforts to prevent removal by failing to offer him a safety plan — seems to rely on section 19-1-115(6)(b)(I), C.R.S. 2024, which requires the juvenile court to find that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from the home" before awarding legal custody to a department. However, even if father can appeal this order, *see People in Interest of M.W.*, 140 P.3d 231, 233 (Colo. App. 2006) (noting that orders entered at the temporary protective custody stage are interim orders not subject to appeal), his argument fails because the court found that "an emergency situation exist[ed] which require[d] the immediate temporary removal of the child from the home." § 19-1-115(6)(b)(II). Because there was record support for this finding, we cannot conclude that the juvenile court erred by awarding the Department custody of the child without first pursuing a safety plan.

¶ 31 As for father's second argument — that the Department failed to make reasonable efforts to reunify him with the child when it did not provide him with protective parenting classes — we are not persuaded for the reasons described above. Following the filing of

17

the petition, the juvenile court entered temporary orders requiring father to attend visits and submit to drug testing. There is nothing in the record showing that the Department failed to offer these services to father; in fact, father requested that evidence of his failure to cooperate with the Department be precluded. The caseworker also testified that the Department offered father other services, including mental health and substance abuse treatment, but he declined to participate in those services. Therefore, even if the Department had a duty to provide father with services before the adjudication, his argument still fails. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (a court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts).

## V. Disposition

¶ 32 The judgment is affirmed in part and reversed in part, and the case is remanded to the juvenile court for further proceedings consistent with this opinion.

JUDGE TOW and JUDGE PAWAR concur.