2024CA1268 Peo in Interest of H-SKR 02-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1268
City and County of Denver Juvenile Court No. 23JV30929
Honorable Laurie A. Clark, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of H-S.K.R., a Child,

and Concerning J.A.R.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GROVE
Harris and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

---

Kerry Tipper, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Michael Kovaka, Office of Respondent Parents' Counsel, Littleton, Colorado, for Appellant

¶ 1    J.A.R. (mother) appeals the judgment adjudicating H-S.K.R. (the child) dependent and neglected.  We affirm.

## I.    Background

¶ 2    In October 2023, the Denver Department of Human Services (Department) received a report that mother had appeared at the hospital claiming to be pregnant when she was not.  Mother returned to the hospital by ambulance several hours later, stating that she was in active labor.  After the second visit, hospital staff placed mother on a mental health hold, and the Department removed the child from her care.

¶ 3    The Department then filed a petition in dependency and neglect.  Mother denied the allegations and requested a bench trial. The juvenile court conducted a trial over two days in February 2024.  After hearing the evidence, the court adjudicated the child dependent and neglected under section 19-3-102(1)(c), C.R.S. 2024 (the injurious environment provision), and 19-3-102(1)(e) (the no-fault provision).

## II.    Sufficiency of the Evidence

¶ 4    Mother contends that the evidence was insufficient to support the juvenile court's decision to adjudicate the child dependent and neglected.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 5    "The purpose of an adjudicatory hearing is to determine whether the factual allegations in the dependency and neglect petition are supported by a preponderance of the evidence, and whether the status of the subject child or children warrants intrusive protective or corrective state intervention into the familial relationship."  *People in Interest of A.M.*, 786 P.2d 476, 479 (Colo. App. 1989).

¶ 6    As relevant here, a child is dependent and neglected if (1) "[t]he child's environment is injurious to his or her welfare" or (2) the child is "without proper care . . . through no fault of [the] parent."  § 19-3-102(1)(c), (e).  A child is in an injurious environment when a child is in a situation that is likely harmful to the child.  *People in Interest of J.G.*, 2016 CO 39, ¶ 26.  "Proper parental care means the minimum level of care or services and

2

necessities that are required to prevent any serious threat to the child's health or welfare." CJI-Civ. 41:7 (2024).

¶ 7 An adjudication of dependency and neglect must be based on existing circumstances and related to the child's status at the time of adjudication. *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008). But that does not mean that a juvenile court must find that the child is receiving improper care at the time of the hearing. *People in Interest of S.X.M.*, 271 P.3d 1124, 1130 (Colo. App. 2011). Instead, an adjudication may be based on current, past, or prospective harm. *See People in Interest of G.E.S.*, 2016 COA 183, ¶ 15.

¶ 8 In considering prospective harm, the task is to determine whether the child will lack proper parental care or the child's environment will be injurious to the child if returned to the parent. *S.X.M.*, 271 P.3d at 1130. Said another way, a juvenile court may consider whether it is likely or expected that a child will be dependent and neglected if returned to the parent. *People in Interest of S.N.*, 2014 COA 116, ¶¶ 15-16. Such a determination may be based on the "parent's past conduct and current circumstances." *See id.* at ¶ 17.

3

¶ 9     Whether a child is dependent and neglected presents a mixed question of fact and law because it requires the application of evidentiary facts to statutory grounds. *People in Interest of M.M.*, 2017 COA 144, ¶ 17. Thus, we review the juvenile court's factual findings for clear error but review de novo the court's legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 10    When determining whether the evidence is sufficient to sustain an adjudication, we review the record in the light most favorable to the prevailing party and draw every inference fairly deducible from the evidence in favor of the juvenile court's decision. *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009). We will not disturb the court's findings and conclusions if the record supports them, even though reasonable people might arrive at different conclusions based on the same facts. *Id.* We may, however, set aside a court's order based on errors of law or findings that do not conform to the statutory criteria. *Id.*

## B. Analysis

¶ 11    At the adjudication hearing, the juvenile court heard testimony from five witnesses: (1) an emergency room nurse; (2) an

evaluator on the hospital's assessment and referral team; (3) an intake caseworker; (4) a family reintegration therapist; and (5) an ongoing caseworker.

¶ 12     The emergency room nurse testified that mother came to the hospital claiming that she was pregnant, but after several tests, hospital staff determined that mother was not pregnant.  The evaluator said that mother made some "mildly delusional" statements during this visit to the hospital, but the evaluator ultimately determined that mother did not meet the criteria for a mental health hold.  The nurse said that mother was provided with some mental health resources and discharged.

¶ 13     The nurse testified that mother returned to the emergency room in an ambulance less than twelve hours later, and this time, the child was with her.  The nurse noticed that the child was wearing only a shirt, even though it was very cold outside.  The evaluator said that mother's "perception of reality was significantly worse" on the second trip to the hospital.  For example, in addition to her continued belief that she was pregnant, mother also reported that she was being drugged, people were tapping her phone calls, and she was being prevented from making outbound calls.  The

evaluator also observed mother's inattentiveness to the child, including an incident in which the child urinated on the floor of the hospital room, but mother did not do anything. Ultimately, the evaluator determined that mother met the criteria for a mental health hold.

¶ 14 Shortly thereafter, the intake caseworker responded to the hospital to speak with mother and take custody of the child. The intake caseworker said that mother denied having any mental health issues and said that she "just needed a break." In her investigation, the intake caseworker discovered that mother and the child had a previous dependency and neglect case in Jefferson County that had closed a few weeks before the events in this case. The intake caseworker said that, in the previous case, mother had taken the child to the hospital claiming that he had been "poisoned by radiation." The ongoing caseworker testified that mother engaged in her treatment plan in the earlier case, including mental health treatment, and as a result, the department returned the child to mother's care.

¶ 15 After mother was released from the mental health hold, the Department arranged for her to engage in family reintegration

therapy. The therapist said that mother attended a few visits with the child but was eventually discharged because the therapist thought that mother needed mental health treatment before she could continue reintegration treatment with the child. The therapist said that, at the final visit, mother was "[v]ery erratic" and made some delusional statements, such as "stating that our courts are going to be taken over by our enemies" and "that she had friends in Syria . . . and Russia that were going to come get [the child] from the foster family."

¶ 16 The ongoing caseworker said that she talked to mother about mental health services, but mother told the caseworker to "stop bringing up mental health services" or she would "stop working with" the Department. The ongoing caseworker noted that mother had been engaged in mental health treatment in the previous case, which allowed the department to return the child to her care, but the caseworker did not believe that mother continued to participate in treatment after the case ended.

¶ 17 The witnesses also noted that mother's mental state vacillated but that she seemed to be able to provide the child with adequate parental care when she was in an "appropriate mental state."

Nevertheless, both caseworkers opined that mother's mental health presented a risk of harm to the child. They testified that the child was three years old, diagnosed with autism spectrum disorder, and non-verbal; therefore, the caseworkers noted that the child was "extremely vulnerable" because he could not self-advocate.

¶ 18 Based on this evidence, the juvenile court determined that the child was dependent and neglected under the injurious environment and no-fault provisions. In so concluding, the court noted that, although the evidence established that mother could provide proper parental care when she was "in a good state of mind," her delusional thinking, coupled with the child's inability to "verbally express any fright or concern for an unsafe situation due to his disabilities," placed the child in an injurious environment and established that he lacked proper care.

¶ 19 On appeal, mother asserts that the juvenile court erred because the evidence showed that she had experienced mental health challenges at the time that the Department filed its petition but did not establish that she was unable to provide proper parental care at the time of the adjudication. We disagree. Recall that an adjudication may be based on current, past, or prospective

harm, *see G.E.S.*, ¶ 15, and that a fact finder must consider whether the child will lack proper parental care or be in an injurious environment if returned to the parent, *S.X.M.*, 271 P.3d at 1130. In this case, the evidence established that mother had experienced delusional thinking that placed that child at risk of harm. The evidence also showed that mother had a previous case involving similar concerns, which was resolved because mother engaged in mental health treatment. But the evidence established that mother did not continue her treatment and when she was not addressing her mental health issues, she could not provide the child with adequate care. The court properly considered this evidence when determining whether the child would be dependent and neglected if returned to mother's care.

¶ 20 Thus, viewing the evidence in the light most favorable to the Department and drawing every fairly deducible inference in favor of the juvenile court's decision, we conclude that the record contains sufficient evidence to support the court's determination that the child was dependent and neglected under subsections (1)(c) and (1)(e) based on evidence that mother had mental health issues that prevented her from providing this vulnerable child with proper care,

9

such that that the child's environment was injurious to his welfare. *See S.G.L.*, 214 P.3d at 583.

### III.   Disposition

¶ 21    The judgment is affirmed.

JUDGE HARRIS and JUDGE PAWAR concur.