25CA1404 Peo in Interest of BBS 03-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1404
Jefferson County District Court No. 25JV30012
Honorable Lindsay VanGilder, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of B.B.S.1 a/k/a El.W. and B.B.S.2 a/k/a En.W., Children,

and Concerning P.S. and D.W.,

Appellants.

---

JUDGEMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Brown and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

---

Kimberly Sorrells, County Attorney, Sarah Oviatt, Assistant County Attorney, Golden, Colorado, for Appellee

Jennifer Walters, Guardian Ad Litem

Robin Tieman, Office of Respondent Parents' Counsel, Boulder, Colorado, for Appellant P.S.

Michael Kovaka, Office of Respondent Parents' Counsel, Littleton, Colorado, for Appellant D.W.

¶ 1     In this dependency and neglect action, P.S. (mother) and D.A.W. (father) appeal the judgment entered on a jury's verdict adjudicating El.W. and En.W. (the children) dependent and neglected.[1]  We affirm.

I.     Background

¶ 2     The Jefferson County Division of Children, Youth, and Families (Division) filed a petition in dependency and neglect alleging that the parents were refusing to allow hospital staff to assess or treat the newborn child, En.W., for a specific medical concern, and that there were concerns that the parents would leave the hospital against medical advice.

¶ 3     A month later, the Division filed a separate petition regarding the older child, El.W., then twenty months old, alleging that the parents gave him kerosene and exposed him to secondhand marijuana smoke.  The petition also alleged that the child was not

---

[1] The parents did not officially name the children at birth because of their sovereign citizen beliefs.  Therefore, the caseworker did not know the names of the children at the time the petitions in dependency and neglect were filed, and the petitions refer to both children as B.B.S.  Throughout the proceedings, the older child was referred to as El.W. and the younger child as En.W.

meeting developmental milestones or receiving appropriate medical care.

¶ 4 The juvenile court held a consolidated jury trial on both petitions over three days. After hearing the evidence, the jury found that the Division had proved that the children were dependent or neglected under section 19-3-102(1)(b) and (c), C.R.S. 2025. Based on the jury's verdict, the court adjudicated the children dependent and neglected as to both parents and consolidated the cases.

¶ 5 Mother and father appeal the judgment of adjudication, though for different reasons.

## II. Mother's Contention

¶ 6 Mother contends that the evidence was insufficient to support the jury's verdict. We are not persuaded.

### A. Applicable Law and Standard of Review

¶ 7 A child is dependent or neglected if, among other elements, (1) the child "lacks proper parental care through the actions or omissions of the parent"; or (2) the child's "environment is injurious to his or her welfare." § 19-3-102(1)(b), (c).

¶ 8 "An adjudication of dependency or neglect must be based on existing circumstances and relate to the status of the child at the

2

time of adjudication." *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008). But that does not mean that a fact finder must determine whether the child is receiving improper care at the time of the hearing. *See People in Interest of S.X.M.*, 271 P.3d 1124, 1130 (Colo. App. 2011). Rather, an adjudication may be based on past, current, or prospective harm. *People in Interest of G.E.S.*, 2016 COA 183, ¶ 15.

¶ 9    "Whether a child is dependent [or] neglected presents a mixed question of fact and law because it requires application of evidentiary facts to the statutory grounds." *People in Interest of M.M.*, 2017 COA 144, ¶ 17. To establish that a child is dependent or neglected, a department must prove the allegations in the petition by a preponderance of the evidence. § 19-3-505(1), (7)(a), C.R.S. 2025; *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

¶ 10    When determining whether the evidence is sufficient to sustain an adjudication, we consider the evidence in the light most favorable to the prevailing party and draw every inference fairly deducible from the evidence in favor of the jury's verdict. *People in Interest of T.T.*, 128 P.3d 328, 331 (Colo. App. 2005). We will not

3

disturb a jury verdict if the evidence supports it, even though reasonable people might arrive at different conclusions based on the same facts. *S.G.L.*, 214 P.3d at 583; *see also Thomas v. People*, 2021 CO 84, ¶ 10 (noting an appellate court may not "invade the jury's province by second-guessing any findings that are supported by the evidence").

## B. Analysis

¶ 11 Viewing the evidence in the light most favorable to the Division, we conclude that the record contains sufficient evidence to support the jury's determination that the children were dependent or neglected under section 19-3-102(1)(c) based on their injurious environment. *See People in Interest of S.M-L.*, 2016 COA 173, ¶ 29 ("[S]ection 19-3-102 requires proof of only one condition for an adjudication."), *aff'd on other grounds sub nom.*, *People in Interest of R.S. v. G.S.*, 2018 CO 31.

¶ 12 An injurious environment is a situation that is "likely harmful" to the child. *People in Interest of J.G.*, 2016 CO 39, ¶ 26. A child's adjudication as dependent or neglected under the injurious environment provision does not require a determination of parental fault. *See id.* at ¶ 44.

¶ 13    The Division presented evidence showing that the family never had a stable or safe home.  While mother was pregnant with the younger child, the parents and the older child lived with father's mother (grandmother) and her boyfriend until shortly before the first petition was filed.  Father's sister (aunt) testified that the home was infested with mice.  Two witnesses testified that the furnace was not working when the temperature was negative twenty degrees, and the aunt testified that their "toes were literally frozen." The aunt opined that the home had not been livable for many years, and father testified that the house was not "truly livable."  The caseworker testified that the parents were eventually evicted, in part, because they never paid for any utilities or rent, and "had not contributed to the home at all."

¶ 14    After the eviction, the caseworker could not locate the parents until mother went to the hospital for the birth of the younger child. The caseworker testified that, a few weeks later, the parents reported that they were staying with father's brother in "a host home for adults who have delays and disabilities that prevent them from living on their own independently."  The Aurora Police Department had "flagged" the home as unsafe because of prior

5

assaults on police officers and told the caseworker that she should not enter the home unless accompanied by law enforcement. When the caseworker tried to visit the home, father refused her access and would not let her see the older child.

¶ 15 The caseworker testified that at the time of the trial, she did not know where the parents were residing because they would not provide an address and would only state that they "lived on the land." And when asked where he was living, father testified that he did not have a residence and "live[s] on the land."

¶ 16 The evidence also showed that there was a risk that the parents would expose the children to high levels of intrafamily conflict. The caseworker testified that when the family lived with grandmother's boyfriend, law enforcement went to the home seven or eight times. The aunt testified that there was constant yelling and that arguments between grandmother and her boyfriend were "[t]errorizing" and "rough." Mother testified that "chaotic stuff" happened in the home. When grandmother's boyfriend tried to evict the parents, father threatened to kill him, and the boyfriend obtained a protection order against father. And grandmother testified that the older child was exposed to some of this conflict.

¶ 17    The caseworker testified that when the parents were at the hospital for the younger child's birth, both parents became "very belligerent and very argumentative to [a degree that] Aurora Police had to be called to the hospital." A neonatal nurse practitioner testified that father was removed from the hospital because of "safety concern[s] to staff and parents," and was told that he could not return.

¶ 18    The jury also heard testimony that the parents exposed the children to harmful substances. The caseworker testified that mother posted on Facebook that "kerosene is good for children because it cures autism and tape worms," and that she consumed kerosene and turpentine during her pregnancy. The caseworker also testified that a family member observed father "insert[] kerosene in [the older child's] mouth" using a syringe. And the Division presented evidence that kerosene is toxic and could cause other respiratory issues.

¶ 19    Although father denied giving the children kerosene, he admitted that he gave the children chlorine dioxide in "mist form." And grandmother testified that she observed father giving the older child "a fine mist of chlorine dioxide with water." The jury heard

7

testimony that chlorine dioxide is a "toxic chemical that should not be ingested" and can cause, among other things, internal injuries and permanent respiratory problems.

¶ 20 Father's uncle testified that he noticed a strong smell of marijuana coming from the room in which the parents were staying with the older child. And the jury heard testimony that when the younger child was born, his umbilical cord and urine tested positive for marijuana.

¶ 21 Thus, there was sufficient evidence from which the jury could find that the children were in an injurious environment. *See id*, at ¶ 26 (concluding that an injurious environment is a situation that is "likely harmful" to the child).

¶ 22 Having concluded that sufficient evidence supported the jury's verdict under section 19-3-102(1)(c), we need not consider whether the children were also dependent or neglected under section 19-3-102(1)(b). *See S.M-L.*, ¶ 29.

### III. Father's Contention

¶ 23 Father contends that the juvenile court violated his first amendment right to raise his children in accordance with his religious beliefs. Father concedes that this issue is unpreserved.

8

Still, he urges us to address his claim under the miscarriage of justice exception to the preservation requirement. *See People in Interest of E.S.*, 2021 COA 79, ¶ 14.

¶ 24 We may consider an unpreserved issue in a dependency or neglect case for the first time on appeal if a juvenile court error involves a miscarriage of justice. *See People in Interest of M.B.*, 2020 COA 13, ¶ 21 ("[G]iven the constitutional nature of parental rights, we will recognize a miscarriage of justice exception for review of unpreserved errors."). The miscarriage of justice exception has a high bar and narrow scope. *See id.* at ¶¶ 23-24. We recognize the exception only in "rare cases, involving unusual or special circumstances, . . . to prevent an unequivocal and manifest injustice." *People in Interest of E.R.S.*, 2019 COA 40, ¶ 38.

¶ 25 Father claims that the Division and the juvenile court did not respect his Judeo-Christian beliefs because (1) the caseworker "made clear that she believed the parents' unwillingness to engage in activities that were contrary to their beliefs was an indication that they were attempting to hide something"; (2) the juvenile court "specifically ordered father not to inform the jury about his beliefs"; and (3) the Division and the "assigned medical care providers," who

assisted with the children's birth, "refuse[d] to show proper deference to the parents' constitutional right to direct their children's care in accordance with their beliefs . . . ."

¶ 26    The caseworker did not testify, as father claims, about "an unwillingness to engage in activities that were contrary to their beliefs." Rather, the caseworker testified that she was concerned because the parents did not take one of the children to see a doctor to "eliminate any medical concerns [regarding] the potential use of kerosene or chlorine dioxide . . . ." And father does not allege that the medical use of kerosene or chlorine dioxide is a component of any Judeo-Christian belief system.

¶ 27    Next, father conflates his religious beliefs with his sovereign citizen beliefs and provides no authority to show that his sovereign citizen beliefs enjoy the same first amendment protections as his religious beliefs. *See People v. Lavadie*, 2021 CO 42, ¶ 7 n.1 ("The 'sovereign citizen' movement is an ideology that 'rejects the legitimacy of United States jurisdiction over its adherents.'" (quoting *United States v. Pryor*, 842 F.3d 441, 445 n.2 (6th Cir. 2016)). When the juvenile court ordered father not to discuss his beliefs,

the court was referring to his sovereign citizen beliefs "about what laws apply" and how "the laws have been violated."

¶ 28 Finally, father does not explain how a lack of deference to his purported religious beliefs by medical care providers affected the outcome of the trial.

¶ 29 Because father did not present his first amendment argument below and has not established that we should apply the miscarriage of justice exception, we decline to address this argument for the first time on appeal. *See M.B.*, ¶ 14 (unless jurisdiction is implicated, appellate courts generally review only issues presented to and ruled on by the lower court).

## IV. Disposition

¶ 30 The judgment is affirmed.

JUDGE BROWN and JUDGE SCHUTZ concur.